## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RANDY SHERMAN, ET AL.**                    **CIVIL ACTION**

**VERSUS**                                   **NO. 23-258**

**DANOS, LLC, et al.**                       **SECTION: "G"(5)**

## ORDER AND REASONS

Before the Court is Defendant Danos, LLC's ("Danos") Motion for Summary Judgment.[1] In this litigation, Plaintiff Randy Sherman ("Sherman") alleges that Danos and Defendant Quarternorth Energy, LLC ("Quarternorth") are liable for injuries which were allegedly caused by Danos' employee while working on a crane owned by Quarternorth.[2] Danos contends that Sherman and his allegedly negligent co-employee are borrowed servants of Quarternorth.[3] For this reason, Danos argues that the claims against it are barred.[4] For the reasons stated herein, the Court finds that this issue requires a factual determination and granting of summary judgment would be inappropriate. Considering the motion, the memoranda in support and opposition to the motion, the record, and the applicable law, the Court denies the motion.

## I. Background

On December 23, 2021, Plaintiff Randy Sherman was working on the Bullwinkle as a crane

---

[1] Rec. Doc. 34.

[2] Rec. Doc. 1.

[3] Rec. Doc. 34.

[4] *Id.*

1

mechanic.[5] Sherman was employed by Gulf Crane Services, Inc. ("GCS"), who in turn had a contract with Defendant Quarternorth Energy, LLC ("Quarternorth"), formerly known as Fieldwood Energy, LLC, to provide specialized services aboard offshore platforms.[6] The Bullwinkle was owned and operated by Quarternorth.[7] Sherman alleges that he was injured while attempting to change the cables on a crane.[8] The petition states that Sherman was injured due to the negligent operation of the crane by Paxton Broom ("Broom").[9] It is alleged that Broom was an individual working in the course and scope of his employment for Danos at the time of the accident.[10]

On December 15, 2022, Plaintiffs Randy Sherman and Lisa Sherman (collectively "Plaintiffs") filed suit against Danos, LLC and Quarternorth Energy, LLC in the 32nd Judicial District for the Parish of Terrebonne.[11] Plaintiffs allege that the negligence of Broom is attributable to Danos pursuant to the doctrine of respondeat superior.[12] Plaintiffs allege that Quarternorth failed to provide a safe environment by which to change the cables to the crane and failed to properly maintain the property free of defects.[13]

---

[5] Rec. Doc. 1-1 at 1.

[6] Rec. Doc. 40 at 12.

[7] Rec. Doc. 1-1 at 1.

[8] *Id.* at 2.

[9] *Id.* "Mr. Pat" is later identified as Paxton Broom in Rec. Doc. 34.

[10] *Id.*

[11] *Id.* at 1.

[12] *Id.*

[13] *Id.*

On January 19, 2023, Quarternorth removed the matter to this Court.[14] On January 20, 2023, Danos filed a Consent to Removal.[15] On March 4, 2024, Danos filed the instant motion.[16] On April 8, 2024, Plaintiff Lisa Sherman filed a motion to voluntarily dismiss her claims,[17] which was granted by the Court.[18] On April 17, 2024, Sherman filed an opposition to the instant motion.[19] On April 23, 2024, Quarternorth filed a memorandum in support of the motion.[20] On April 26, 2024, Danos filed a reply memorandum in further support of the motion.[21]

## II. Parties' Arguments

### A.   Danos' Arguments in Support of the Motion

Danos argues that Sherman and Broom are both borrowed servants of Quarternorth.[22] Because the Longshore Harbor Workers' Compensation Act ("LHWCA") prohibits suits against co-employees, Danos asserts that Sherman's claims against Danos are barred.[23]

Danos contends that Sherman is a payroll employee of GCS.[24] Danos states that Broom is a payroll employee of Danos.[25] Danos asserts that the Master Service Contracts ("MSC") between

---

[14] Rec. Doc. 1.

[15] Rec. Doc. 4.

[16] Rec. Doc. 34.

[17] Rec. Doc. 35.

[18] Rec. Doc. 38.

[19] Rec. Doc. 40.

[20] Rec. Doc. 41.

[21] Rec. Doc. 42.

[22] Rec. Doc. 34-1 at 1.

[23] Id. at 1, 14.

[24] Id. at 1.

[25] Id.

Quarternorth and Danos and Quarternorth and GCS do not expressly or impliedly prohibit borrowed servant status.[26]

Applying the nine-factor test set forth by the Fifth Circuit in *Ruiz v. Shell Oil Co.*,[27] Danos argues that all factors weigh in favor of finding borrowed servant status.[28] First, Danos argues that Quarternorth controlled what, when, and whether work was being performed on the Bullwinkle.[29] Danos points to deposition testimony from Sherman and Walter LeCavalier ("LeCavalier"), GCS's corporate representative, to support this argument.[30]

Second, Danos argues that the work upon the Bullwinkle was performed on Quarternorth's behalf.[31] Danos contends that based on deposition testimony, all the work being performed on the Bullwinkle was in furtherance of Quarternorth's objectives.[32]

Third, Danos contends that an agreement or understanding existed between the original

---

[26] *Id.* at 3.

[27] 413 F.2d 310 (5th Cir. 1969). The Fifth Circuit instructs courts to consider the following factors in determining whether an individual is a borrowed servant, although no single factor is determinative:
  (1) Who had control over the employee and the work he was performing, beyond mere suggestion of details or cooperation?
  (2) Whose work was being performed?
  (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
  (4) Did the employee acquiesce in the new work situation?
  (5) Did the original employer terminate his relationship with the employee?
  (6) Who furnished the tools and place for performance?
  (7) Was the new employment over a considerable length of time?
  (8) Who had the right to discharge the employee?
  (9) Who had the obligation to pay the employee?

[28] Rec. Doc. 34-1.

[29] *Id.* at 5.

[30] *Id.* at 6–7.

[31] *Id.* at 8.

[32] *Id.*

and borrowing employer.[33] Danos asserts that Quarternorth executed MSC's with both Danos and GCS, and neither agreement prohibited borrowed employee status.[34]

Fourth, Danos argues that both Sherman and Broom acquiesced to their working arrangement with Quarternorth.[35] Danos contends that based on deposition testimony, both Sherman and Broom worked for several years on the Bullwinkle prior to the accident.[36] Danos asserts that Sherman's acquiescence is evidenced by his testimony wherein he states whom he received work instructions from, what policies he was subject to, who set his work schedule, and whether he ever complained about his working conditions or arrangements.[37] Danos avers that both Sherman and Broom understood their working arrangement and acquiesced to them.[38]

Fifth, Danos argues that GCS and Danos had minimal contacts with Sherman and Broom.[39] Danos contends that LeCavalier testified that GCS's communications with Sherman were limited to filling orders for crane parts.[40] Danos avers that GCS never issued any instructions or countermanded any assignments from Quarternorth to Sherman.[41] Danos asserts that Sherman testified that he made calls to GCS every day to "let them know what's going on."[42] Danos avers

---

[33] *Id.* at 9.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.* at 11.

[39] *Id.*

[40] *Id.*

[41] *Id.* at 12.

[42] *Id.*

that Broom had little to no contact with any of Danos' onshore personnel.[43]

Sixth, Danos argues that Quarternorth furnished the place of performance and most of the tools used for work.[44] While Sherman testified that he provided some of his own hand tools, Danos contends that most of the tools necessary to complete the work were provided by Quarternorth.[45] Danos asserts that Broom stated that all the tools he used were provided by Quarternorth.[46]

Seventh, Danos contends that Sherman worked on the Bullwinkle for at least three years prior to the accident.[47] Danos asserts that Broom worked on the Bullwinkle for nine years prior to the accident.[48] Danos argues that this factor supports finding borrowed servant status.[49]

Eighth, Danos argues that Quarternorth had the authority to remove Sherman and Broom from the platform.[50] Danos contends that this factor weighs in favor of finding borrowed employee status.[51]

Ninth, Danos argues that Quarternorth ultimately had the obligation to pay Sherman and Broom for the work performed on the Bullwinkle.[52] Danos contends that this type of payment structure supports finding borrowed servant status.[53]

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.* at 13.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

Lastly, Danos contends that the LHWCA prohibits suits against co-employees.[54] Danos asserts that the LHWCA provides the exclusive remedy for an offshore worker against his nominal employer, which therefore immunizes the nominal employer from a tort action by an injured employee.[55] Danos states that the Fifth Circuit has extended the tort immunity provision to include borrowing employers under the "borrowed employee doctrine."[56] While Danos maintains that Broom was not negligent, Danos contends that as Quarternorth's borrowed employee, Sherman cannot sue Danos for Broom's alleged negligence.[57] Danos argues that Sherman's recovery is limited to the exclusive remedies provided for by the LHWCA.[58]

**B.       *Sherman's Arguments in Opposition to the Motion***

Sherman contends that the MSCs between Danos and Quarternorth and GCS and Quarternorth are identical, and both are clear that Danos and GCS are considered independent contractors.[59] Sherman asserts that the parties never intended to consent to a borrowed servant relationship.[60] Sherman states that he received a W-2 from GCS and was required to bring his timesheets to GCS's office in order to get paid.[61] Sherman avers that he has never received a check or payment from Danos or Quarternorth.[62]

---

[54] *Id.* at 14.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] Rec. Doc. 40 at 3.

[60] *Id.*

[61] *Id.* at 3–4.

[62] *Id.* at 3.

Sherman contends that Quarternorth would not supervise his work, rather they were simply there to monitor and coordinate all of the individual subcontractors.[63] Sherman states that he would get approval from both Quarternorth and GCS to perform work, and no one told Sherman how to do his job or supervised him.[64]

Sherman argues that summary judgment is not proper here.[65] Sherman insists that there are issues of material fact in dispute as to his employment status.[66] Sherman contends that he was not a borrowed employee of Quarternorth at the time of his injuries.[67] Sherman asserts that he was employed by GCS who in turn had a contract with Quarternorth to provide specialized services aboard offshore platforms.[68] Sherman avers that the contract between the parties is clear that the relationship was that of principal and independent contractor, and Quarternorth would not have control over the details of the work performed.[69]

Applying the nine-factor test set out in *Ruiz,* Sherman argues that, first, the MSC states that "neither Contractor nor any member of Contractor Group shall be deemed to be subject to the control or direction of Company [Quarternorth] as to the details of the Work."[70] Sherman contends that this is an explicit acknowledgment that the work to be performed by GCS's employees was

---

[63] *Id.* at 4–5.

[64] *Id.* at 5.

[65] Rec. Doc. 40 at 10.

[66] *Id.* at 12.

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.* at 15.

under the control of the independent contractors.[71] Sherman references deposition testimony from himself, LeCavalier, and Steven Kunie, GCS's coordinator, to support the contention that he was responsible for his own work.[72] Sherman asserts that Quarternorth never exercised the requisite level of control over his work to rise to the level of borrowed servant status.[73]

Second, Sherman argues that the work being performed at the time of the accident was that of GCS.[74] Sherman states that he was repairing one of the cranes, which is the business of GCS, and repairing of the cranes was the purpose of GCS's contract with Quarternorth.[75] Sherman contends that Quarternorth is in the business of oil and gas drilling, not building and repairing cranes.[76] As such, Sherman asserts that this factor weighs against borrowed servant status.[77]

Third, Sherman argues that none of the parties intended to enter into a borrowed servant relationship.[78] Sherman contends that the MSCs between Danos and Quarternorth and GCS and Quarternorth specifically stated that Danos and GCS would be considered independent contractors.[79] Sherman points out that the contract states "…nothing in this contract is intended or shall be construed to create or establish any agency, joint venture, or partnership between the

---

[71] *Id.*

[72] *Id.* at 15 – 16.

[73] *Id.* at 26.

[74] *Id.* at 17.

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

parties."[80] Sherman avers that this factor weighs against borrowed servant status.[81]

Fourth, Sherman argues that he did not acquiesce to a borrowed servant relationship.[82] Sherman contends that because the parties never intended to be in a borrowed servant relationship, as evidenced by the contracts, there could not be an acquiescence to such a relationship.[83] Sherman states that while Quarternorth did coordinate all the jobs on a given day, the instructions did not include direction or control over how and by what means the jobs were to be completed.[84] Sherman asserts that even after being given instructions from Quarternorth, he would still get approval from GCS for his work.[85]

Fifth, Sherman argues that GCS never terminated its relationship with him.[86] Sherman states that he communicated with GCS daily as evidenced by his and LeCavalier's deposition testimony.[87] Sherman contends that this factor weighs against borrowed servant status.[88]

Sixth, Sherman argues that he and GCS provided most of the tools required to perform his work.[89] Sherman points to deposition testimony wherein he stated that ninety percent of the tools

---

[80] *Id.* at 17–18.

[81] *Id.* at 18.

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.* at 19.

[87] *Id.* at 19–20.

[88] *Id.* at 21.

[89] *Id.*

used were his own.[90]  Sherman contends that this factor weighs against borrowed servant status.[91]

Seventh, Sherman asserts that he worked for numerous companies.[92] Sherman states that he did not exclusively work on Quarternorth's platforms.[93] Sherman argues that as it pertains to the duration of the contract between GCS and Quarternorth, this factor would be neutral considering that the parties never intended to acquiesce to an employer-employee relationship.[94]

Eighth, Sherman contends that GCS retained the right to discharge him.[95] Sherman asserts that the MSC states that while Quarternorth has the right to deny access to its facilities, "Company [Quarternorth] and Contractor [GCS] agree that Company shall have no right to terminate or affect any other term or condition of employment of any member of Contractor group."[96] Sherman states that Steven Kunie also acknowledged that only GCS had the right to terminate an employee.[97] Sherman avers that this factor weighs against borrowed servant status.[98]

Ninth, Sherman contends that GCS was responsible for paying him.[99] Sherman states that his time sheets were sent to GCS and were then approved by Quarternorth.[100] Sherman asserts that

---

[90] *Id.*

[91] *Id.* at 22.

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.* at 23.

[98] *Id.*

[99] *Id.*

[100] *Id.*

he was never paid by Quarternorth, and the only entity responsible for paying him was GCS.[101] Sherman argues that this factor weighs heavily against borrowed servant status.[102]

Finally, Sherman avers that the exclusive remedy provisions of the LHWCA does not grant Danos immunity from liability as it relates to this accident.[103] Mr. Sherman argues that the motion for summary judgment should be denied.[104]

## C.   *Quarternorth's Arguments in Support of the Motion*

Quarternorth argues that Sherman and Broom are both borrowed servants of Quarternorth, and thus, Sherman's claims should be dismissed as he and Broom were co-employees.[105] Quarternorth relies on *Mosley v. Wood Group PSN, Inc.*[106] wherein summary judgment was granted finding borrowed servant status when seven of the nine *Ruiz* factors favored borrowed servant status.[107]

Applying the nine-factor test set out in *Ruiz,* first, Quarternorth contends that it controlled Sherman's activities while on the Bullwinkle.[108] Relying on *Mosley*, Quarternorth contends that the fact that Sherman had specialized skills and "did not need to be told how to do his job" does not preclude borrowed employee status.[109] Quarternorth asserts that the first *Ruiz* factor (control)

---

[101] *Id.*

[102] *Id.*

[103] *Id.* at 25.

[104] *Id.*

[105] Rec. Doc. 41 at 1.

[106] 760 F. App'x 352 (5th Cir. 2019).

[107] Red. Doc. 41 at 2.

[108] *Id.*

[109] *Id.*

is clearly met.[110]

Quarternorth argues that the second factor, whose work is being performed, is also satisfied.[111] Quarternorth contends that Sherman admitted that he was doing the work of Quarternorth on the Bullwinkle.[112] Quarternorth asserts that Sherman's maintenance and repair of Bullwinkle's cranes helped personnel and cargos get to and from vessels, and Sherman transferred tools and equipment to and around the Bullwinkle.[113] Quarternorth avers that the second factor is satisfied.[114]

Third, Quarternorth argues that the provisions of the MSCs do not prevent a borrowed employee relationship from existing.[115] Quarternorth points to deposition testimony from a representative of GCS wherein he states that Sherman was working under the control and direction of Quarternorth.[116] Quarternorth relies on Fifth Circuit precedent and a prior decision by this Court wherein summary judgment was granted even though the third factor did not support borrowed servant status.[117]

Fourth, Quarternorth contends that Sherman worked on the Bullwinkle platform for years, and he was never dissatisfied or complained about his working conditions.[118]

---

[110] *Id.* at 3.

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.* at 4.

[118] *Id.*

Fifth, relying on *Mosley*, Quarternorth contends that the minimal contact Sherman had with GCS supports the legal conclusion that he was Quarternorth's borrowed servant.[119]

Sixth, Quarternorth contends that it provided the cranes, associated materials, the location of the work, and all of Sherman's transportation to and from the Bullwinkle.[120] Relying on Fifth Circuit precedent, Quarternorth argues that this is sufficient for a finding of borrowed servant status.[121]

Seventh, Quarternorth asserts that Sherman worked on the Bullwinkle for at least three years prior to the accident, which Quarternorth argues clearly satisfies his borrowed employee status.[122] Quarternorth asserts that this Court has previously held that a period of employment with the borrowing employer for many years supports borrowed servant status.[123]

Eighth, relying on *Mosley*, Quarternorth argues that it had the authority to remove Sherman from the Bullwinkle.[124] Quarternorth contends that this supports a finding of borrowed servant status.[125]

Ninth, relying on *Mosley,* Quarternorth contends that since it reviewed and approved Sherman's timesheets, the ninth factor weighs in favor of borrowed servant status.[126]

Finally, Quarternorth argues that it is clear under Fifth Circuit precedent that summary

---

[119] *Id.* at 5.

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *Id.* at 6.

[126] *Id.*

judgment on borrowed servant status is proper even where there are some potential issues of material fact.[127]

### D.    *Danos' Arguments in Further Support of the Motion*

In the reply brief, Danos argues that all material facts are established by admissions and evidence.[128] Danos contends that many arguments made by Sherman are unsupported by deposition testimony.[129] Danos argues that the MSCs do not prohibit borrowed servant status.[130] Danos states that the language in the MSCs regarding an agency relationship has no bearing on an employer-employee relationship or borrowed servant status.[131]

Danos revisits the nine-factor test set out in *Ruiz*, arguing that the control factor does not require control of the manner and means by which the agent accomplishes its work, but only that Quarternorth told Sherman "what work to do, and when and where to do it."[132] Danos references deposition testimony from Steven Kunie, Sherman's immediate supervisor, who stated that Sherman was instructed on what he should do by Quarternorth.[133] Danos argues that the cases cited in Sherman's memorandum are based on the borrowed servant doctrine as an offense in the claimant's administrative claim and are inapplicable here.[134]

---

[127] *Id.*

[128] Rec. Doc. 42 at 1.

[129] *Id.* at 2.

[130] *Id.* at 3.

[131] *Id.*

[132] *Id.* at 4.

[133] *Id.* at 5.

[134] *Id.*

Danos contends that the work on the Bullwinkle was Quarternorth's work.[135] Danos reiterates that Sherman and Broom both testified that the work performed was on behalf of Quarternorth.[136] Danos argues that Sherman and Broom both acquiesced to borrowed servant status since they worked on the Bullwinkle for several years, received instructions from Quarternorth, and never objected to the working arrangements.[137]

Danos asserts that while GCS may have objected to a job on behalf of Sherman on one occasion, this does not preclude borrowed servant status.[138] Danos contends that GCS and Danos had minimal contact with Sherman and Broom, which weighs in favor of a finding of borrowed servant status.[139] Danos concedes that Sherman provided many of his own tools for work.[140] Danos states that it adopts and reiterates the arguments made by Quarternorth in support of summary judgment.[141]

### III. Legal Standard

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[142] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations

---

[135] *Id.* at 6.

[136] *Id.*

[137] *Id.* at 7.

[138] *Id.*

[139] *Id.*

[140] *Id.* at 8.

[141] *Id.*

[142] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

or weighing the evidence."[143] All reasonable inferences are drawn in favor of the nonmoving party.[144] Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[145] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a matter of law.[146] The nonmoving party may not rest upon the pleadings.[147] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[148]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact.[149] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[150] If the moving party satisfies its initial burden, the burden shifts

---

[143] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000)).

[144] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves*, 530 U.S. at 150).

[145] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[146] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cites Serv. Co.,* 391 U.S. 253, 289 (1968)).

[147] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[148] *See id.*; *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[149] *Celotex Corp.*, 477 U.S. at 323.

[150] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (internal citation omitted).

to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[151] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[152]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[153] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[154]

## IV. Analysis

Under the LHWCA,[155] employees are prevented from bringing tort actions against their employers and their recovery is limited to certain statutorily prescribed compensation benefits.[156] Because a borrowing employer enjoys the same protection as a nominal employer, a "borrowed employee" (also referred to as "borrowed servant") is also barred from suing the borrowing employer for anything more than workers' compensation benefits.[157] Thus, if Sherman is found to be Quarternorth's "borrowed employee," then Sherman will be barred from suing Quarternorth in tort.

---

[151] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[152] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

[153] *Little*, 37 F.3d at 1075 (internal citations and quotation marks omitted).

[154] *Morris*, 144 F.3d at 380.

[155] 33 U.S.C. § 905(a).

[156] *Melancon v. Amoco Production*, 834 F.2d 1238, 1243-1244 (5th Cir. 1988).

[157] *Id.*

Section 933(i) of the LHWCA provides that "[t]he right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured . . . by the negligence or wrong of any other person or persons in the same employ."[158] "While this provision limits an employee's rights, it . . . at the same time expands them by immunizing him against suits where he negligently injures a fellow worker."[159] Therefore, if Sherman and Broom are both found to be borrowed employees of Quarternorth, Danos could not be held vicariously liable for Broom's negligent actions because Sherman was not entitled to recover for the negligence of a person "in the same employ."[160]

Although the parties dispute whether Sherman and Broom were borrowed employees of Quarternorth at the time of Sherman's injury, they agree that whether an employee is a borrowed employee constitutes an issue of law for the Court to decide by applying the nine-factor test set forth by the United States Court of Appeals for the Fifth Circuit in *Ruiz v. Shell Oil Co.*[161] The nine factors to consider are:

> (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
> (2) Whose work is being performed?
> (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
> (4) Did the employee acquiesce in the new work situation?
> (5) Did the original employer terminate his relationship with the employee?
> (6) Who furnished tools and place for performance?
> (7) Was the new employment over a considerable length of time?

---

[158] 33 U.S.C. § 933(i).

[159] *Perron v. Bell Maint. & Fabricators, Inc.*, 970 F.2d 1409, 1411 (5th Cir. 1992) (internal citation omitted).

[160] *Mosley v. Wood Grp. PSN, Inc.*, 760 F. App'x 352, 358 (5th Cir. 2019) ("Section 933(i) of the LHWCA says that '[t]he right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured . . . by the negligence or wrong of any other person or persons in the same employ.'" The parties agree that based on this section, if Villemarette, Mosley, and Trahan are found to be borrowed employees of Fieldwood, Wood Group cannot be held vicariously liable for their negligent actions because Mosley was not entitled to recover for the negligence of "persons in the same employ.").

[161] 413 F.2d 310 (5th Cir. 1969).

(8) Who had the right to discharge the employee?
(9) Who had the obligation to pay the employee?[162]

No single factor, or combination of them, is determinative; although, in many cases, the Fifth Circuit has considered the first factor—control—to be the central factor.[163] The issue of borrowed employee status is a "'matter of law' for the district court to determine," but some cases involve factual disputes on the issue of borrowed employee status and require findings by a factfinder.[164]

Applying the first factor, control, it appears that both Quarternorth and GCS had some level of control over Sherman. Sherman's deposition testimony indicates that he received instructions and daily orders from Quarternorth.[165] On the other hand, Sherman also testified that he would check in with GCS daily to "let them know what's going on," and GCS would provide approval and denial for his work.[166]

Furthermore, the MSC provides the following as it relates to Quarternorth's control over GCS's employees:

> Contractor [GCS] shall be, and perform at all times as, an independent contractor; and *neither Contractor nor any member of Contractor Group shall be deemed to be subject to the control or direction of Company [Quarternorth] as to the details of the Work.* For avoidance of doubt, nothing in this Contract is intended or shall be construed to create or establish any agency, joint venture, or partnership between the Parties. It is expressly understood that Company is interested only in the compliance of the Work with the specifications hereunder and under the applicable job order. Company may be entitled to make such inspections and audits of the Work as may be necessary, in Company's sole discretion, in furtherance of its

---

[162] *Id.*

[163] *See, e.g., Melancon*, 834 F.2d at 1245.

[164] *Id.* at 1244–45.

[165] Rec. Doc. 34-4 at 4–5.

[166] *Id.* at 3–4; Rec. Doc. 40-4 at 45.

interest and to determine whether the Work is or has been performed in accordance herewith and with the applicable job order.[167]

The contractual language explicitly states that GCS's employees are not subject to the control or direction of Quarternorth, which directly conflicts with certain deposition testimony. Further, the contract contains language stating that "[n]o change, modification, extension, renewal, ratification, waiver, or rescission of this Contract or of any of the provisions hereof shall be binding unless it is in writing and signed by both Parties."[168]

"Whether the parties had an understanding that modified the contract may raise disputed factual issues."[169] In *Brown v. Union Oil Co. of California*, the Fifth Circuit held that conflicting evidence regarding whether the parties impliedly modified the contract raised a factual dispute that should be determined by a factfinder when the remaining factors do not overwhelming show that the employee was a borrowed employee.[170] Considering this precedent and the conflicting evidence in the record, the Court finds that there are fact issues in dispute on the issue of control. As such, the Court will briefly address the remaining *Ruiz* factors to determine whether they overwhelmingly show that Sherman was a borrowed employee.

As to the second *Ruiz* factor, it appears that the work being done was that of Quarternorth. Even though Sherman argues that Quarternorth is in the business of oil and gas drilling, not

---

[167] Rec. Doc. 34-2 at 7.

[168] Rec. Doc. 34-2 at 11.

[169] *Brown v. Union Oil Co. of California,* 984 F.2d 674, 678 (5th Cir. 1993) (citing *Melancon*, 834 F.2d at 1245 n.13).

[170] *Id.* at 679.

building and repairing cranes; Sherman's work was an "essential, although only incidental" aspect of Quarternorth's work.[171] Thus, this factor weighs in favor of a finding of borrowed servant status.

The third *Ruiz* factor asks whether there was an agreement, understanding, or meeting of the minds between the original and the borrowing employer. As stated above, the MSC between GCS and Quarternorth appears to directly conflict with the actions carried out by the parties. While the Fifth Circuit has noted that the reality at the worksite and the parties' actions in carrying out a contract can impliedly modify, alter, or waive express contract provisions,[172] the MSC clearly states that no provision of the contract can be altered or modified without written notice signed by the parties. As such, there are factual issues in dispute as to this factor.

Fourth, based on length of time Sherman worked for Quarternorth, a period of more than three years, with no complaints regarding his working conditions, it seems that Sherman acquiesced to his working arrangement. Thus, this factor weighs in favor of a finding of borrowed servant status.

Fifth, the Court does not find that GCS terminated its relationship with Sherman. While this factor does not "require a lending employer to completely sever his relationship with the employee," it does require that the lending employer "cease control in its servant."[173] Here, GCS retained control over many important aspects of Sherman's employment: his pay, his performance, his supplies, his insurance.[174] Deposition testimony also shows that Sherman was required to make

---

[171] *See e.g., Melancon,* 834 F.2d at 1245.

[172] *Stauffer Chemical Co. v. W.D. Brunson,* 380 F.2d 174, 182 (5th Cir. 1967). *See also McDonough Marine Service, Inc. v. M/V ROYAL STREET,* 465 F.Supp. 928, 935 (E.D.La. 1979), *aff'd* 608 F.2d 203 (5th Cir. 1979).

[173] *Mays v. Dir., Off. of Workers' Comp. Programs*, 938 F.3d 637, 645 (5th Cir. 2019).

[174] *See id.*

some form of contact with GCS daily. Thus, this factor weighs against a finding of borrowed servant status.

Sixth, Sherman stated that he furnished "ninety percent" of his own tools required for work, some of his tools were provided by GCS, and Quarternorth provided the place of performance and transportation to and from the place of performance. The Court finds that this factor is neutral.

Seventh, Sherman worked upon the platform owned by Quarternorth for a period longer than three years. Thus, this factor weighs in favor of a finding of borrowed servant status.

The eighth *Ruiz* factor asks who had the right to discharge the employee. Per the MSC, GCS retained the right to terminate its own employees, and Quarternorth had no right to "terminate or affect any other term of employment of any member of Contractor Group; provided, however, that, with cause (which includes, without limitation, the failure to abide by any of Company's policies), Company may require that Contractor remove a particular member of Contractor Group from the performance of Work hereunder."[175] "The proper focus when considering who has the right to discharge the employee" is whether the purported borrower "had the right to terminate [the worker's] services with *itself*," not his employment with the lending employer.[176] The Fifth Circuit has held that this factor weighed in favor of borrowed employee status where a borrowing employer had the right to remove men from their position on the platform.[177] Thus, this factor weighs in favor of a finding of borrowed servant status.

---

[175] Rec. Doc. 34-2 at 4.

[176] *Mays,* 938 F.3d at 646 (citing *Capps v. N.L. Baroid-NL Industries, Inc.*, 784 F.2d 615, 618 (5th Cir. 1986) (emphasis added)).

[177] *Mosley,* 760 F. App'x  at 362.

Ninth, Sherman stated that he was paid directly by GCS. Sherman submitted his timesheets directly to GCS, and the timesheets were approved by Quarternorth thereafter.[178] Danos argues that this payment structure supports a finding of borrowed servant status, but this is not always true. The Fifth Circuit has stated that, "[a]lthough a payment to a nominal employer may sometimes constitute an indirect payment to the borrowed servant, that is not always the case…Typically, the distinguishing factor is the basis on which the purported borrower makes its payments."[179] The Fifth Circuit made a distinction between when the nominal employer was paid based on the number of hours worked by the borrowed servant and where the amount received by the nominal employer was based on a percentage.[180] There has been no evidence presented which indicates the payment structure between GCS and Quarternorth. As such, the Court finds that factual issues remain in dispute as to this factor.

Based on the contractual provisions laid out above, and the testimony and conduct highlighted by both parties, there is conflicting evidence regarding at least two of the nine *Ruiz* factors. Further, the remaining factors do not "overwhelmingly" show that Sherman was a borrowed employee. Given the disputes of fact regarding the most critical factor—control the parties exercised—the Court will deny summary judgment. Because the Court finds that there are facts in dispute precluding summary judgment on the issue of whether Sherman was a borrowed employee of Quarternorth, the Court need not reach the issue of whether Broom was a borrowed employee of Quarternorth.

---

[178] Rec. Doc. 40-4 at 34–35.

[179] *Mays*, 938 F.3d at 646–47.

[180] *Id.*

### V. Conclusion

For the reasons stated herein, the Court finds that several factual disputes preclude summary judgment. The factual disputes will be resolved by the jury as fact-finder at trial, and then the Court will determine Sherman's borrowed employee status as a matter of law. Accordingly,

**IT IS HEREBY ORDERED** that the Motion for Summary Judgment[181] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this __1st__ day of July, 2024.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[181] Rec. Doc. 34.